In our second case today, Bradford Kendrick is against the Carter Bank & Trust Company. And Mr. Kendrick is represented by Mr. Grimes. Yes, Your Honor. Mr. Grimes, good to see you. Good to see you, Judge. May it please the Court, before I begin, I'd like to introduce Kaylee Gordon-Shopp, a new lawyer with my firm. This is her first time appearing before the Fourth Circuit, her first time observing an argument before the Fourth Circuit as well. We're good to have you with us as well. Thank you. May it please the Court, this is an age discrimination case from the Western District of Virginia. It comes before you on summary judgment. The District Court erred by failing to permit Mr. Kendrick to depose Board Chair and GovComm Chair James Haskins. In our view, Mr. Haskins may be the most important witness in this case. He received Mr. Kendrick's age discrimination complaint in February of 2017 and told Kendrick that he would investigate and get back to him. He never did. He knows, therefore, about the investigation and its outcome. He knows which witnesses were interviewed and what was said. He also has information concerning the termination of Kendrick's employment. Did he seek to depose him as his first witness? Pardon me? Did he seek to depose Haskins as his first witness? We sought to depose him. I think it was our first witness. I don't want to tell you wrong. But you got him deposed. No, we never deposed him. That's the problem. I see. We never deposed him. He would have been our first witness. The defense fought it tooth and nail. That's why we're here. To quote from Hamilton, he was in the room when it happened. There's evidence that the Board made the decision to terminate Mr. Kendrick. Haskins knows who made the decision to terminate, when it was made, and why it was made. He also knows whether there was any discussion of severancing Kendrick back in January 2019 when Kendrick was put on a severance list and why he was not severanced then. He also stated that we need young people on the Board, and while that is not actionable in and of itself by any means, as Judge Conrad stated, and I assume this is the same Judge Conrad you were talking about. It's not. It's not.  There are two Judge Conrads. There were, and you had a Judge Conrad in Virginia in Roanoke. Yes. And I think in your case, we're talking about the Roanoke Judge Conrad. The Roanoke Judge Conrad. In the last case, we were talking about the North Carolina Judge Conrad. Thank you, Judge King. I'm talking about Glenn Conrad, who passed away from cancer some time ago. Wonderful man, wonderful judge. Wonderful man. A geoblastoma. Well, I diverge. He said that that statement could be reflective of the bank's overall view of older workers. That was the value of it, according to Judge Conrad. It does not matter that Jim Haskins is older himself. Of course he wants to keep his job. He makes $100,000 a year attending monthly Board meetings. He's a big fish in a small pond, Martinsville, Virginia, and he enjoys the perks. In addition, it was natural for Mr. Kendrick to have gone to Mr. Haskins. Haskins or his law firm had represented Mr. Kendrick for more than 30 years. Mr. Carter was dying of cancer. Again, the timeline, Mr. Kendrick went to Haskins in February 2017. Mr. Carter died, the founder of the bank, on April 7, 2017. When was the bank founded? 1986, I believe. And the founder put his name on it. That's where we get this name. It was a series of smaller banks gathered, eventually became Carter Bank & Trust. Yes, Worth Harris Carter, Jr. is the founder and the CEO of the bank. Yes, sir. Without Haskins' deposition, Kendrick never had a fair shot at discovery. We were hamstrung throughout this litigation, and you don't have a complete record. The district court's reliance, and here, this is an error of law. The district court's reliance on the judge-made Apex Doctrine and the Shelton test were misplaced. This case presents this court with the opportunity to decide whether this circuit wants to adopt those two tests, the Apex Doctrine and the Shelton test. Neither doctrine has been expressly recognized by this court. But this is an error of law, the district court's reliance on those cases. Shelton, for example, was clarified by the 8th Circuit in 2002 and PAMIDA, if I'm saying that right, P-A-M-I-D-A, it's in the brief, versus E.S. Originals. The 8th Circuit clarified that Shelton only applies when a party seeks to depose opposing counsel about current litigation and other matters involving the strategy of the current litigation, not when it applies to decisions made by someone who wears two hats, as in this case, which is exactly what the case is here. Nor does the Apex Doctrine apply. That doctrine applies, let's say I wanted to depose, just for example, the CEO of Walmart who had nothing to do with the employment decisions at issue, I could see how the Apex Doctrine may apply to bar that deposition. This is just another case, though, in which the judge-made law, the Apex and Shelton Doctrine, must yield to simple application of the Federal Rules of Civil Procedure. If the court agrees with the- We reviewed all of this that you're arguing about for abuse of discretion. Yes, yes. The abuse of discretion, as you pointed out in the previous case, Judge King, is an error of law. That is application- No, an error of law can itself, standing alone, be an abuse of discretion. But the standard of review is abuse of discretion. You're right. One hundred percent, that's right. Under the circumstances, you were entitled to take this deposition. That's our position. If you agree with us on that point, there's no reason to reach the other issues, because you don't have a complete record. Why review this case twice, reverse and remand, let us take the deposition, then review it when it comes before you, if at all, if at all. What about all those records he took out of the bank and gave to his lawyer? Yes, he did that. He took a number of records from the bank and gave to his lawyer, and that, of course, would be me. And your question is, because the bank argues on brief, well, that's why Kendrick was terminated. That's what the bank argues. That's not true. That's one of the things that's in here. Look at the term. He took records that were confidential. If we find that Kendrick's use of the customer information was legal, can the bank still defeat that retaliation claim? If you find that the use of the customer information was legal, can they still defeat the retaliation claim? A jury could still rule against Mr. Kendrick, but not as a matter of law, Judge Floyd. A jury could rule against Mr. Kendrick. If this is one of, as Judge King described earlier, a thin case, it still goes to the jury. But I do want to answer your question, Judge King, about the removal of those records, because there are two cases we cite on brief, one from the Eighth Circuit, one from New Jersey, which gathers a series of federal cases that says that that is permissible. Now, this court may disagree, but that would be then established. You're saying that, like, customer information, like my bank account records, somebody in the bank, some officer in the bank who's in a dispute with the bank could take my records and give them to his lawyer and use it in connection with a dispute at the bank. The customer seems to be ought to be, that kind of information seems to me that ought to be started carefully. But that's not what was done here. It's not what was done here. It's what sounds like was done here. They made a good job of arguing that, but that's not the case. So what is it you say was done with the customer records here? The customer records were taken by Mr. Kendrick. He gave them to, not the customer records, the documents. The documents were taken by Mr. Kendrick.  And given to you. That's correct. That's just exactly what Judge King just said. But that's not customer account bank information. That's not considered. Well, it is. What was it? The fact that I'm a client of the bank, the fact that I have a bank account there. I don't know what business that is of the public or outside the bank. That's not what was published, Your Honor. If you look at Confidential Exhibit 1, and if you look at what's in that and compare that to the bank's confidentiality policy, what's in that exhibit primarily is discussions of Kendrick's performance. That is core soft. Primarily, you said. Yes, sir. Primarily.  Understand that what was happening at the time is the bank was replacing its operating system. Something called core soft. That was Mr. Carter's baby. He owned a one-half. They were upgrading their records maintenance system or their computer records or their systems.  Operating system. Technology. Passing up your client is what they say. And they got somebody else in there to upgrade things. Right. There is a stereotypical categorization that older. He didn't like it, and he took a bunch of records and gave it to counsel and brought it during a law suit. Those records help refute the argument that he was not doing his job. The issue was core soft. Yes, Judge Steckler. What's the JA site for confidential exhibit one that you were talking about that show us the kind of thing that he took? I'm speaking from memory. JA 2285, I believe.  JA 22 what? That's the termination letter. 2285? I'm wrong. That's the termination letter. It's in sealed volume 10, Judge Thacker. It's a concealed volume. Sealed volume 10. Sealed. Sealed volume 10. Sealed volume 10. And it was sealed because it was deemed confidential. I guess the bank moved to seal it all. The bank moved to seal it. We didn't oppose that. They can file a sealed volume. Initially, you made allegations about it. Allegations about the contents. Exhibit one was filed with the district court as an exhibit to the amended complaint. Yes, sir. Yes, sir. And filed publicly. Filed on PACER. Yes, sir. And then removed. And I guess opposing counsel can tell us. So it's a public record. For a while. For a while. So it's still out there in Internet land. No. No. No, Judge King. It's not still out there. Immediately, understand the way this happened. I went to Mr. Haskins' office. They let us examine, I don't know what it was, a dozen. You're making yourself a witness now. Well, you have to.  So we asked Haskins. Because he is. Tell us what is confidential. Tell us what is confidential. And they wouldn't tell us, so we filed. Did they say it was all confidential? No. No. They didn't say any of it was confidential. So we filed a motion for a protective order, which is unheard of in the world of employment law. The defense files the motions for a protective order. And so only then did we know what the bank considered confidential. And, yes, it was on PACER for a period of time, but they asked us to remove it. It was immediately removed. Exhibit one. Did appellant obtain those documents through discovery, or did appellant just take them from the bank? Both. So he took records from the bank that were not his to take, and then he was terminated. Well, I mean, that's debatable, but at least the one, whether they were his to take or not. But the one, because, and I say that, Judge Thacker, because in Quinlan, in the Eighth Circuit case, those two courts said that the appellant can remove the records from the bank. Because they talk about Korshoff. The problem was never Mr. Kendrick. They say that Kendrick was not, I'll use the word competent, it's not quite that strong, but wasn't doing a good job as an IT director, but he was. But he was. David Hart says that he's an excellent IT director. He's rarely seen any who are better. And, yes, and that's what that exhibit one talks about is the switch from Korshoff to Fiserv or Jack Henry or some other vehicle. But, anyway, we don't know this because we were not permitted to depose Mr. Haskins. As I said, the also- And nobody else could have, you couldn't have obtained that information that you wanted from Mr. Haskins through another source? No. The only, no. Mr. Kendrick went to Mr. Haskins in February of 2017 because Mr. Carter was ill. They had no HR director in the 21st century. And because Mr. Haskins had, or his firm, had represented him for some 30 years to complain about age discrimination. He was, there were only two people in that conversation. What allegations of age discrimination do you have post-2018, post-October 2018? Our, yes. Our position is the decision was made to get rid of the older workers when Litz Van Dyke took over. He took over in July of 2016, and the plan was hashed in July in- Right, but anything- Yeah. Any allegation pre-October 2018 is time barred? It's, the events themselves are time barred. For example, the promotion, the hiring of Matt Spears, time barred. But it still comes into evidence under National Railroad. It's all evidence of age discrimination under National Railroad. But to answer, to answer your question, and I have to go back in time. You ask, since, you wonder if there's any direct evidence of age discrimination from 2018 forward. And I have to say that there's not. That there's no direct evidence of age discrimination. But here's the history that led up to the termination of Brad Kendrick. That answers my question. And if you want to talk, as far as I'm concerned, I don't have any other questions. If you want to talk about the history of everything, maybe on rebuttal, unless the other two judges have questions. My goodness. I see that I'm out of time. Yes, sir, I'll stand down. Unless there are any other questions now. No, no. You saved some time. Yeah. Mr. Tower? Good morning, Your Honors. My name is King Tower, and I am here with my colleagues, Josh Treese and Christine Ward, on behalf of Carter Bank and Trust. They go by Carter Bank now. Your Honors, I think the first issue, obviously, that Mr. Grimes raised, I'll address that first as well, which is that the purported deposition of Jim Haskins was raised with the court. The magistrate judge at the time, Judge Ballew, ruled without prejudice that Mr. Haskins' deposition could not be taken initially. And as Your Honor referred to, there was, under Apex and Shelton, this idea that the plaintiff should go forward and try to show that there is some unique evidence or some reason why Mr. Haskins' deposition should be taken. That evidence never appeared. As Mr. Grimes said, Mr. Kendrick himself says that back in 2017, some three years before the termination, he called or reached out to Mr. Haskins on one occasion to complain about the conduct of the CEO or Mr. Litz Van Dyke. There is no evidence that there was any investigation that was not turned over. There was no reason to depose Mr. Haskins. Mr. Kendrick's testimony about that one contact he had three years ago stands in the record undisputed. I'm a little confused. I thought this was an age discrimination case, and it seemed like there were three issues. Number one, whether or not there was satisfactory performance. I didn't have anybody say anything about that. Number two, they raised the frequency of age-related comments that they say were pervasive in your bank. And then number three, this deal about the documents you talked about, whether that was legal or illegal. Is that the core issue in this case? If it is, talk about it. Sure. Thank you, Your Honor. And I think that is the core issue, and my only point was to say that there is no evidence that Mr. Haskins has on those points. So I'll go ahead and address some of that. Your Honor, as counsel just conceded, there is really no evidence in this case that applies to the conduct that is not time-barred. There is a ruling that has not been challenged that the actions prior to October of 2018 are time-barred. There is a hostile work environment allegation, so that could conceivably wrap everything together. But Judge Dillon quite effectively laid out what the allegations were, and none of them touch on age discrimination or the decision in question. So they're not able to serve as evidence of age discrimination in any kind of disparate treatment sense. And they're just simply not probative of any kind of severe or pervasive environment. And so the court found that no reasonable jury could return a verdict. And was he terminated for taking those documents from the bank? That's correct, Your Honor. And he had quite some time before this filed a charge of discrimination against the bank. No repercussions from that. He filed a lawsuit while he was still working with the bank and continued to work with the bank while the lawsuit was pending. That's right. And then he got into this squabble about the records, and he was terminated for it. That's right, Your Honor. That's what they call what the McDonnell Douglas did. Well, we are isolating. What changed? You're right. And nothing about the filing of the lawsuit under the Age Discrimination and Employment Act in December 2019 caused him to get any kind of adverse action. It was only when he took these documents, shared them with his attorney, and they became public in violation of. And now he says he was entitled to take these documents. What's your response to that? Your Honor, I think that he's suggesting that there is an Eighth Circuit case or a New Jersey case that may contemplate that there may be some circumstances in which illegal activity might still be protected activity.  Your Honor? Whistleblower? Right. Some type of whistleblower situation, I think, is what that's contemplating. Well, what kind of information was here that's being talked about that he took to his lawyer? Your Honor, that's what's so starkly different. You know, I have to be careful saying exactly what I'm talking about because it's in the sealed volume that has been referenced, Volume 10. Well, you can say it right here now. I want you to say it. I want to know what it was. Right. It was board minutes. It was what? Board minutes? Board minutes. But the key part about it is that there are records, you know, written discussions of the bank information of customers and specific financial... What kind of information about customers? You know... Names of customers? Absolutely. Account numbers of customers? Identifying customers, identifying... I'm not sure about account numbers.  Telephone numbers? But dollar figures about... Dollar figures about their accounts? This is why Mr. Grimes... What else about customers? You know, whether they will be, you know, a good bet for the bank and just strategy about doing business with these customers and their personal accounts. But more specifically about the customer's confidential information. What about confidential information that belongs to customers? Right. Well, I mean, the fact that they are involved in these transactions, and I guess... Loan records? It's discussion of their banking business. And I think the best thing for me to do... Consideration of whether they're financially solvent or financially responsible, that sort of thing, right? That's right, Your Honor. And I think 4406, 4409, JA4111, those pages, and 4419, those four pages are great examples of... If you look at those, you'll see what we're talking about. And those are sealed documents. And I think you'll... But you don't seal them from us. No, no. You can access them.  And that's what I'm... Yeah. Right. And if you want the courtroom cleared, we'd have to take that up. Right. But if you think it's some top secret, I mean, we've done that kind of stuff, too. Yeah. But we're trying to ask you questions about what you're talking about. Sure. And I understand, Your Honor. And we're trying for a straight answer about what we're talking about. Absolutely. And I think that the... And you said 4406, 4409, 4411, and 4419? Yes, Your Honor. Okay. And I think that there is really no dispute that on those pages, you will see that the board minutes reflect discussions about these customers, their private financial information. And as Judge Dillon found, it was a violation of law, even, to make that public without their knowledge. Who found that it was a violation of law? Judge Dillon, the district court in this case. Judge Dillon, she ruled in your favor. She said the bank had provided the legitimate, nondiscriminatory reason for Kendrick's termination. That's what her opinion says on page 18 of it. That's right, Your Honor. But what would happen to the bank in the context of, like, the FDIC, if they hadn't handled this thing the way they did? So, Your Honor, I think that the exhibit was immediately removed, and so the FDIC didn't involve itself in this case. But it was on PACER. Right. Which means it was out there. It was. It was out there around the world, I guess. For some period of time. For how long? Not long. How long? I don't know the exact number of days, but we can certainly look to the record for that. But it was a matter of days, I believe, before that was ruled. A matter of days? Was it three days or a thousand days? I don't know if my colleagues know that number. No, I don't know the exact number, Your Honor. But it was in that probably single-digit number of days. And then somebody could access PACER and print it out. They could. And give it to anybody. And to get back to your point about the whistleblower part, this information, this private customer information, had nothing to do with the reason this document was being attached. Well, was it taken off of PACER before he was terminated? I don't believe so. I think he was terminated quite promptly. But it was right around the same time. Terminated promptly because of that. So it was taken down around the same time that he was terminated, right? That's right.  So my reading of the record is it was uploaded through his attorney on May 8, 2020, and then he was terminated on May 29, 2020. So that would be about three weeks he was up there.  Right. And I think it had been removed before the termination. To answer your question. Yeah. Thank you. And so, Your Honor, I think getting back to your point about protected activity, the Netter case in this court holds that when someone takes confidential information in violation of law, that's not protected activity. If there were some circumstance where this court perceived that to be interfering with the retaliation law or somehow preventing a whistleblower or a retaliation plaintiff from vindicating their rights, then I think that would raise a question of whether you wanted to stick with Netter. But that's not the situation here. We actually don't even understand why this document was attached to the amended complaint. Mr. Grimes mentioned that it somehow showed that he had been performing well. He alleged that in the amended complaint attached this exhibit. You know, it doesn't matter whether he intentionally did it to disclose customer information, but it certainly has that appearance. In any event, this doesn't raise the case where the person took information that was confidential and that that was what they were using in the participation or in the opposition activity that they engaged in. Your Honor, I think this is more akin to a situation where a person takes information and has violated North Carolina law on taking the confidential information from their employer, just like in the Netter case here. The court, the district court, found that Graham Leach Bliley was at issue. And so for those reasons. You said North Carolina law. I thought you were the Virginia bank. We are. I was just referencing the Netter case. Oh, the Netter case. Yeah, in that case it was state law that was violated. Well, back to my point. This is an age discrimination case. You say you terminated him for cause based on illegal records. He says he was discharged because of his age. What are the allegations as to him being an old man, senile? What is it? So, Your Honor, they are scant. But the things that the district court looked at, there were four particular disparate treatment type allegations that were reviewed. And the court looked at the statement that was alleged to have been made to the effect that we need to be finding our replacements. And that was in April of 2017. That's right, Your Honor. And so in terms of proximity and temporal proximity to. So that's time. Well, it's time barred as a discreet act. And even if you say that we're going to look at it as some sort of evidence of motive, it's not remotely proximate to the adverse action, obviously. And it doesn't have anything to do with the decision about Mr. Kendrick. It's this sort of generalized statement about succession planning. And so there was also the evidence that Mr. Kendrick was placed on a severance list that his manager and other managers were all asked, if we roll out a severance plan, who would you want to have on it? And he was identified back in I think it was January 2019 for that. But that never came to fruition for anyone. That was just never acted upon. And there is no evidence that that has anything to do with any adverse action that was taken against Mr. Kendrick. In contrast, it was days after the bank became aware that he had wrongfully taken these documents, given them to his attorney, and caused them, we believe, to be placed on PACER. I don't believe that you should credit the – Did you say lawfully or unlawfully? Taken unlawfully. Well, make sure you've got the right word. Thank you, Your Honor. And I think that there is one other thing in the appellant's brief that seems to imply that because the attorney filed the claim, that somehow that means Mr. Kendrick is not responsible for it. Obviously, we don't think that's true. We think Mr. Grimes was acting as his agent, as his attorney at the time, that he is responsible for that. But really the key, I think, is the exhibit that was filed simply revealed the wrong that had already been done by Mr. Kendrick in taking the document and giving it to his attorney, and that that was, from our perspective, the but-for cause of the termination. It wasn't anything to do with age because there are these very scant allegations about age that I think effectively, Your Honors, the appellant is conceding that there's not enough evidence by putting so much emphasis on this deposition that wasn't taken. I do want to return to that for one minute just to be able to say that it is also in the record that Mr. Grimes went back and asked for additional depositions in addition to those allowed by the rules. He was granted that by the magistrate judge. At the time, he still had five depositions to take. He used all of those depositions on witnesses other than he did not reserve anyone for Mr. Haskins, but he also did not attempt to comply with the rules. He did try to establish that Mr. Haskins' testimony would be needed in this case and would be unique. He didn't take any board members other than those who were executives anyway, Mr. Van Dyck and Mr. Kerebitakis. And so for those reasons, he failed to show that Mr. Haskins' deposition would have had any relevance. He also then didn't raise the issue again until after discovery had closed. He did bring the issue back up, but by this point, discovery is closed. He's used all 11 of his depositions that he'd been given, and the court didn't find any reason to reverse itself and did not allow the deposition to be taken. But it's immaterial in our view because there's simply no indication that anything Mr. Haskins could say about what he did after he was called in years later one way or the other. So it looks like an attempt to just try to take a deposition of trial counsel, and he did, Mr. Haskins, of course, withdraw from the case early on, but he was trial counsel in this case at the time of the termination. When Mr. Kendrick was terminated, Jim Haskins was the attorney representing Carter Bank in this case. And so that's why the court wanted to exercise its discretion to tread lightly about whether to allow that deposition, didn't rule it out categorically, set up a situation where the appellant could try to go meet that test, and the appellant just didn't try to do that, didn't come back with any evidence to show that Haskins had any relevant information, even potentially had any relevant information that might come out in the deposition. So, Your Honor, we believe that, again, referring to that standard of use of discretion, it certainly was not abused. Your Honors, the evidence, again, is that Mr. Kendrick had been at issue with the bank in this lawsuit for many months before there was any adverse action taken, whereas when what the bank proffers as the reason for the action. How long was it from the time of the filing of the complaint to the termination? So, it was, I guess, roughly five to six months, Your Honor. It was May that was the termination, and the case was filed in December the year prior. But the charge of discrimination had been filed in August of 2019. So, really, he had been, you know, in that situation where he was engaging in that protected activity, which he was entitled to do, and not being retaliated against for months and months. And it only changed when he was revealed to have taken these documents and shared them with his attorney. And, again, even just the sharing with the attorney before you get to filing anything is a violation of law and shouldn't have been done under the bank rules as well. Your Honor, I think that there, as I said, there is good reason to follow the Netter decision in this case and to find that this is a situation where the plaintiff is not engaged in any protected activity. Even if you were to determine that there was protected activity, and certainly the filing of the case itself is protected, there's no causation evidence. There's simply no evidence. And even if you resolve all inferences, reasonable inferences, in favor of Kendrick and disputed evidence in his favor, the district court correctly found that no reasonable jury could have come back and found that this decision was based on age or was based on any protected activity. I'll mention one last thing, Your Honors, and, of course, take any questions you have, and that is there is one other element that's complained about, which is not getting performance evaluations, really 2019 and 2020. It was only there until May of 2020. The district court correctly found that there was no evidence of any impact of those reviews. Effectively, the full record really shows that Carter Bank didn't have any systematic process of doing performance reviews until it hired its current chief HR officer and that those were rolled out over time, and basically 2020 was when they finally kind of got those straight. So he did not get a review. That's true. Did not have any impact and shouldn't be considered an actionable item, an adverse action. And even if it were, there's no evidence that the reason he didn't get a review had anything to do with his age or any protected activity. So for those reasons, Your Honor, we would ask that you affirm the district court and rule that the decision should stand as it is. Thank you very much, Mr. Tower. Thank you, Judge King. Mr. Grimes. Thank you, Your Honor. Again, I'll run out of time, but I'll try to answer these questions. First, I looked, Judge Thacker, at the exhibits, the page numbers that were mentioned by counsel just a moment ago. Page 4406, there's nothing about a single customer name, account information, loan information. Nothing. 4409, same thing. Nothing there about loan or account information. 44 or customer name. 4411, the same thing. Nothing about customer loan or account information. On the last page that he mentioned, 4419, there is the name Jim Justice there, but no loan or account information. Governor Jim Justice, now Senator Justice, has been at war with Carter Bank and Trust for many, many years. He's a customer of the bank. Customer of the bank. Well, he was a customer of the bank, and they ended up in lawsuits with the bank. That's a matter of public knowledge. A matter of public knowledge, a matter of public knowledge. But that doesn't mean anything about Jim Justice. His dealings with the bank can be disclosed in his complaint. His dealings with the bank are not disclosed in the complaint. If you look at the document. I don't know what you disclosed. I honestly don't. But the fact that Jim Justice's names weren't coming up here, I don't know how you can say that that's proper. What was the point of uploading all this stuff to PACER? Because it talks about CoreSoft. It talks about the problems with CoreSoft. The bank says that all these IT problems are Mr. Kendrick's fault. CoreSoft was Mr. Carter's baby. He had a half interest in it. And Mr. Carter. And so if we look at the pages that opposing counsel gave to us, we'll see that they talk about CoreSoft? No, that's the pages they didn't tell you about. I mean, I can tell you the CoreSoft page. So why did you upload the pages they referenced, if they don't talk about CoreSoft? What was the point of that? It was a document. The entire document was uploaded, whatever it was, 10 or 12 pages. Just willy-nilly upload the whole bank's board minutes. And by the way, to answer your question, Judge King, it was removed within a day, within 24 hours. What was removed? The document that the defense asked to be removed was removed from page within 24 hours. Judge Thacker gave dates three weeks. So it was removed on May 9th? Is that what you're saying? Within 24 hours, yeah. Okay. So it was uploaded on May 8th. And you're saying it was removed on May 9th. Well, I'm speaking from memory. It was filed on May 8th. And it was, as I recall, it was removed on May 9th, the following day. As I recall. I'm speaking from memory. PACER ought to show that. Oh, right. Yeah. Or sealed. I don't know what they did, but took it off or sealed it. Oh, wait. So you didn't take it off. They took it. They had to take it off. Well, yes. I mean, the court system, the CMECF system, the clerk takes it off. All we can do is ask that something be taken off. Okay. So you asked the day after? You asked on May 9th for the clerk to take it off? Yes. You did?  Yeah, we got a call from Mr. Haskins. I'm sure you did. Asking that it be removed, and it was removed, yes. Okay. I'm going to ask you the same question I asked Mr. Tower. I don't understand this. Their defense is you took documents. That has nothing to do with age. The question is, what are your allegations that he was discriminated against based on his age? Such as he's going to be replaced by a younger man or woman. I mean, I haven't heard anything about age. Yes, sir. And I'll get there right now. Karvatakis went to Brad Kendrick. Kendrick works in IT. There's a thing that people think that older people cannot learn technology. So Karvatakis goes to Kendrick and says, Brad, how old are you? When was that? I'm 60 years. When was it? Yeah, what year? I think it was in 2017.  Before October 2018. Right. After Litz Van Dyke started the Young Professionals Group and, yeah, he went to him and said, how old are you? I'm 60. Well, you need to be looking for your replacement. And, by the way, how old is Diane? She's, whatever it was, 64. And how old is Lee? 63. They need to be looking for their replacements too. He said, you're too old, you can't learn the new technology, and that's why we're getting rid of you. And that's item one, Judge King. CEO Van Dyke said there are some banks. Judge Floyd. Judge Floyd. I apologize to you. I'd like to be 85 too. Yes. Van Dyke noted that there are some banks that have age limits for their board. The bank's consultant. Now, this is the consultant who was hired by Litz Van Dyke because Litz said I need to be paid. Was this also before October 2018? The statement, there are some banks that have age limits for their board, was before 2018. Okay. So what age discrimination allegations are there post-October 2018? The bank assigned to Mr. Kendrick two sham titles, business continuity plan administrator and another title, no job duties. When was that? No job description. When was the alleged sham title? It would have been assigned in 2017. Okay. I'm asking about what age discrimination allegations are there after October 2018? Kendrick was excluded from meetings necessary to perform his new job duties until the day he was fired. So from October 2018 to whenever he was fired. May of 2020. May of 2020. It was continuing. He gave him a title, big title. Hmm? Big titles. Gave him a big title. Gave him a big title. What was the title? It really sounded like he was. They were big titles like he was some, you know. You're correct. They gave him a big title. Here they are. Chief information security officer and also an acronym CISO and business continuity plan coordinator. They gave him two titles. He never performed one duty ever. That was in 2017.  It was time hard. What he gave him, this basically sounds like a sinecure. You ever heard of a sinecure? No, sir. That's a big time title, sometimes in the government even, they say, to a job that has a salary and no work. Well. You had a sinecure case. He didn't bring it on time. So that was, no, I disagree with that. I think he did bring it on time. I know you disagree with that. Yeah, that's correct. I know you disagree with that. Any other questions? Did you appeal that? Pardon? Did you appeal the statute of limitations ruling? No, we've not appealed a statute of limitations ruling. All right. Any other questions? I don't have any. All right, thank you for your time. Well, wait. Okay. None? Thank you. Thank you, sir. Yes, sir. And I want to say that Judge Sacker and I are going to come down and greet counsel. And I want counsel then to come up to the bench and greet our distinguished colleague, Judge Flowey. And then all three of us are going to take a break. I mean, all three that are sitting here are going to take a break. And then we'll be short. And then we're going to come back and we'll take up the next case. This honorable court will take a brief recess.
judges: Robert B. King, Stephanie D. Thacker, Henry F. Floyd